**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

**SANTIANA "TINA" ERVIN,**
      **Plaintiff,**

**vs.**

                                **Civil Action No.**

**FEDERAL EXPRESS CORPORATION d/b/a
FEDEX EXPRESS,**
      **Defendant.**

## COMPLAINT FOR DAMAGES

COMES NOW the Plaintiff, Santiana "Tina" Ervin, and brings this Complaint for Damages and Injunctive Relief against her former and longtime employer, the Defendant Federal Express Corporation (hereinafter "FedEx Express" or "Defendant") for wrongful discrimination due to her age (over 40), for wrongful discrimination due to her race (as the factor or motivating factor) and/or for wrongful and retaliatory termination[1] all in violation of the law. In support thereof, Plaintiff states the following:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over Plaintiff's claims pursuant to: (A) 28 U.S.C. §1331, and  28 U.S.C. §1343(a)(3) and (4) in that this civil action arises under the laws of the United States and  it seeks, among other things, to secure equitable and other relief to redress the deprivation of a right, privilege or immunity secured by the Constitution or under acts of Congress

---

[1] Plaintiff would appeal her wrongful termination through the Defendant's GFT Process and would be eventually granted a retirement, but not reinstated. Plaintiff has also not been compensation for her wrongful termination or the discriminatory treatment. This is discussed more *infra*.

providing for the protection of civil rights; (B) pursuant to 42 U.S.C. §2000e, *et seq*., Title VII of the Civil Rights Act of 1964 in that this civil action seeks relief from discrimination and retaliation against Plaintiff because she filed a complaint of discrimination based on age and race; (C) pursuant to the Age Discrimination in Employment Act ("ADEA") of 1967, as codified, 29 U.S.C. §§ 621 *et seq*.; and (D) 28 U.S.C. §1367 for supplemental jurisdiction in that this civil action also seeks relief under the Tennessee Human Rights Act, T.C.A. §4-21-101, *et seq*.

2.      At all times relevant, Defendants are and have been an employer within the meaning of Title VII, 42 U.S.C. §2000e, *et seq*., within the meaning of the ADEA, 29 U.S.C. §§ 621 *et seq*.; and within the meaning of the Tennessee Human Rights Act, T.C.A. §4-21-101, *et seq*.

3.      Plaintiff received her Notice of Right to Sue from the Equal Employment Opportunity Commission (EEOC), dated December 10, 2019 regarding her EEOC Charge No. 490-2020-00484 alleging discrimination and retaliation after engaging in a protected activity (filing an age and race discrimination complaint and opposing unlawful conduct).

4.      The lawsuit is timely filed within 90-days after Plaintiff received her Dismissal [from the EEOC] and Notice of Rights ("Right-to-Sue"). Plaintiff received her Right-to-Sue after December 11, 2019 -- the date of mailing by the EEOC. The Right-to-Sue is attached as Exhibit A.

5.      Plaintiff is filing this suit in Federal court and does not have any state court cases pending, including that she does not have any "based on a common nucleus of operative facts."

**PARTIES**

6.      Plaintiff, Santiana ("Tina") Ervin (hereinafter referred to as "Ms. Ervin" or "Plaintiff"), is an adult, female citizen of the United States, who resides and has resided at all times pertinent to the events referred to herein in Shelby County, Tennessee.

7.      Defendant, Federal Express Corporation (hereinafter referred to as "FedEx Express" or "Defendant"), is a Delaware Corporation with its principal office located at 3610 Hacks Cross Road, Memphis, TN 38125-8800 and can be served via its registered agent for service of process C T Corporation System, 300 Montvue RD, Knoxville, TN 37919-5546 US.

**FACTS**

8.      Plaintiff is an African American female who is 62 years of age.

9.      Plaintiff began working at FedEx Express in February 1986.

10.     Plaintiff was a temporary, full-time employee, making coffee for the pilot(s), and did this job for approximately two months.

11.     Plaintiff then applied for and received an HR Assistant position which was full-time on or about April 1986. Her manager at the time was Bennie Williams. The HR Assistant position scheduled appointments for Personnel Reps, who assisted employees working in the HUB with employment issues. She also attended job fairs, among other duties. Plaintiff was in the HR Assistant Position until on or about 1997.

12.     While working as an HR Assistant, Plaintiff assisted managers and HR Representatives at times who were in charge of policies and procedures for FedEx Express.

13.     Plaintiff remained in the HR Assistant position for a period of years working for different managers during those years until on or about 1997 when Plaintiff became a Recruitment Coordinator, with Linda Pappas as her then manager.

14.   The title of Recruitment Coordinator was later changed to Recruitment Specialist and Plaintiff progressed to Senior Recruitment Specialist, with essentially the same job functions as a Recruitment Coordinator but with seniority recognition.

15.   This Senior Recruitment Specialist position entailed Plaintiff traveling all over the country to recruit and hire non-exempt employees including, handlers, couriers, and ramp agents. In this position, she also assisted the personnel reps and managers in hiring exempt employees. Plaintiff was also responsible for hiring handlers, security officers and mechanics for the Memphis location.

16.   Plaintiff did this Recruitment Specialist/Senior Recruitment Specialist duties for approximately eight years.

17.   Then, although her title did not change, her duties changed to assisting with compliance issues. This change of duties happened on or about the time when FedEx Express entered into a business relationship with the federal government, postal service. To perform her new duties, Plaintiff moved to Hacks Cross, Building F.  While performing these new duties, Plaintiff had numerous managers.

18.   When Plaintiff came to Hacks Cross, Building F, Plaintiff was responsible for assisting with placement of applicants in the clerical pool. She also had responsibilities with checking compliance for potential jump-seat users and was responsible for referrals from all executives for their suggested potential hires for the HUB. Plaintiff was also responsible for reviewing applicants for summer internships and assisting with internship placement.

19.   In approximately 2010, Plaintiff applied for, interviewed and was selected for the Affirmative Action Administrator position, reporting initially to Thelma Person.

20.    The job duties for the Affirmative Action Administrator position were to ensure compliance with federal laws in the recruitment and hiring of all positions, except appointment executive position. Plaintiff's duties also included keeping track of the diversity of all hires and ensuring that all positions were properly posted.

21.    Because of the nature of the work done by FedEx Express and its working relationship with the federal, state and city, it is subject to periodic audits, including the FedEx Express hiring practices. Plaintiff assisted FedEx Express in responding to these audits. Plaintiff was also responsible for an Internal Narrative Affirmation Plan that must be posted on FedEx Express website by the end of FedEx Express's fiscal year (June 1), as well as ensuring internal website was currently up-to-date.

22.    When there was an audit by a governmental entity, for example, as to compliance with age, race and sex (female) recruitment, applicant flow, hiring, promotion, terminations and incumbents, Plaintiff assisted FedEx Express in responding to those audits. As part of some responses, Plaintiff would create reports e.g., pivot table report (a pivot table is a technique in data processing) to ensure accuracy in data and communicate with legal for any adverse impact (ensuring there was not any disparity in the selection process for hiring or promotions that disadvantages individuals of a particular race, sex and age, *etc*.).

23.    Plaintiff also assisted with reviewing and reporting on individuals in the applicant pool for any given position or title upon which an audit was based. Plaintiff worked on domestic audits for FedEx Express.

24.    Plaintiff was also responsible for filing the FedEx Express EEO-1 Survey reports annually with U.S Equal Employment Opportunity Commission (EEOC), which consisted of reviewing job categories, including but not limited to race and ethnicity for each location. Plaintiff

was also responsible for filing the annual VETS-4212 reports which consisted of reviewing job categories, the number of protected veterans, the number of total veterans hired at FedEx Express, the new hires of protected veterans, and the total hires for the reporting year for each FedEx Express location.

25.     During Plaintiff's extended employment with FedEx Express (thirty-three years) she never had any discipline until her wrongful termination, which promptly followed and was due to Plaintiff filing an internal EEO complaint of age and then race discrimination (and/or part of the ongoing discrimination about which she had complained).

26.     Plaintiff throughout her long employment with FedEx Express always had satisfactory job performance. For the last two years of her employment as the Affirmative Action Administrator, she received Exceeds Expectations on her job performances.

27.     Due to her excellent work she received the Eagle Eye, Five Star Award. It is the highest award at FedEx Express for going above and beyond. She received this on or about 2018.

28.     Plaintiff received numerous BZ (Bravo Zulu) Awards for outstanding service during her employment.

29.     During Plaintiff's 33 years of service with FedEx, Plaintiff had an outstanding work record, was a loyal employee receiving numerous accolades for outstanding performance, leadership, for training of managers and upper managers on Affirmative Action, for being a team player, volunteerism and for going above and beyond.

30.     On or about the beginning of 2019, FedEx Express offered a  buyout ("VBO Plan") to employees and Plaintiff, based on her experience as an employee to be an employee who was reasonably led to believe (i.e., based upon comments, lack of comments, and actions taken by management) that she would be the recipient of the buyout.  The Plaintiff was asked to train her

would be successors and develop SOPs (Standard Operating Procedure Manuals).  Plaintiff was also asked to complete EEO-1 Survey report, upload the Affirmative Narrative which was due on May 31, 2019.  Plaintiff was also asked if she could complete the VETS-4212 before May 31, 2019.  Plaintiff indicated she could not because the report would be due September 30, 2019. But she was willing to stay until August 31, 2019 to complete the report.

31.    As part of the conduct by management which reasonably led Plaintiff to believe that she would receive the buyout, Plaintiff's job responsibilities and duties were being reduced including that in December 2018 Plaintiff's then-manager Ms. Johnson transferred an HR advisor to assist Plaintiff with some of her job functions and this HR Advisor was slated to become Plaintiffs successor.

32.    In January 2019 Plaintiff discussed the VBO with her manager Ms. Johnson (an African American Female) and in response (which also led Plaintiff to reasonably believe she would receive the requested buyout) Ms. Johnson asked Plaintiff to complete specific job responsibilities before May 31, 2019, including completing EEO-1 survey report(s), audit preparation and submission(s), and annual development plan(s) and narrative plan(s). Plaintiff was also informed that her Managing Director, Ms. Oliver knew she (Plaintiff) requested the buyout.

33.    Both Ms. Johnson and Ms. Oliver knew that Plaintiff reasonably believed she would receive the buyout and made no comments to the contrary. Ms. Johnson also took steps consistent with or in accordance with Plaintiff's reasonable belief that she would receive the buyout.

34.    Plaintiff reasonably believed and relied upon the statements and actions of her manager that she would receive the VBO.

35.    Plaintiff completed a number of her obligations and submitted documents on March 4, 2019, as instructed.

36.    Plaintiff was removed as the primary person for communications regarding AAP Mock audits. The HR person who was to replace Plaintiff after the buyout was assigned as the point person for these audits.

37.    Plaintiff's role, duties and responsibilities were being reduced from Plaintiff and given to the HR advisor who was to be Plaintiff's successor. The HR advisor was younger than Plaintiff.

38.    Plaintiff informed her manager Ms. Johnson that the VETS-4212 report would be due on or about September 30, 2019 and that Plaintiff could not complete her initial part of that report by May 31, 2019. On account of this, Plaintiff discussed with her manager the that she was willing to remain with the company until August 31, 2019 so that Plaintiff could submit the appropriate report. Ms. Johnson told Plaintiff that she would inform the MD Oliver (Younger Black Female) about this.

39.    On or about April 2019, Plaintiff was informed via email that she would not receive the VBO buyout.

40.    Plaintiff was informed that a younger African American female, Ms. Bush was to receive the VBO instead of Plaintiff.

41.    When Plaintiff was denied the buyout (upon which she had reasonably relied), she raised a verbal complaint on or about April 24, 2019 with her immediate manager. She also spoke with her Managing Director ("MD") on or about April 24, 2019. She then complained verbally to the HR VP Ms. Castell (a White Female) on or about April 26, 2019; and verbally complaint to her HR Senior VP, Barbara Wallander, (White Female) on or about May 1, 2019.

42.     On or about May 13, 2019 Plaintiff complained in writing as part of her appeal to the VBO Committee, wherein she asserted that the process was unfair in that a younger employee who was supposed to be her replacement was given the VBO, and that she had been led to believe that she would receive the VBO.

43.     By email dated on or about May 14, 2019 Plaintiff was informed that her appeal denial would be submitted to the appeals committee.

44.     By letter dated on or about May 28, 2019 Plaintiff was informed that the VBO Appeals Committee determined that because Plaintiff was not selected to participate in the VBO she was therefore not eligible to receive the severance plan benefits, and that this decision was "based on business needs."

45.     On or about June 3, 2019 Plaintiff continued her complaint in an email to Ms. Wallander wherein she referenced "critical internal HR issues" and the "withholding critical information from upper management that affected my [her] eligibility status" for the VBO, and requested a meeting.

46.     Plaintiff had several meetings with Ms. Wallander concerning the "critical internal HR issues" including but not limited to the wrongful denial of the VBO based on Plaintiff's age. These meetings were prior to the August 26, 2019 scheduled meeting with CEO Colleran (White Male).

47.     Plaintiff was following her chain of command, appealing through the channels as to the lack of fairness and the problems from not receiving the buyout (which she had been led to believe she would receive) including allegations of age discrimination.

48.     In at least one of the discussions with Plaintiff's HR Senior VP Barbara Wallander, Plaintiff asked her Senior VP Wallandar if she could meet with the CEO Don Colleran, as she wanted to bring the entire matter to his attention. This was during the summer 2019.

49.     Plaintiff met with Senior VP Wallander on or about August 9, 2019. It was during this meeting that Plaintiff requested that Ms. Wallander schedule a meeting for her (Plaintiff) with CEO Colleran. Ms. Wallander told Plaintiff that she would try to make this meeting happen.

50.     This request to meet with her CEO Don Colleran was after she verbally raised issues amounting to an EEO.

51.     She believed her Senior VP Wallander had scheduled the requested meeting when Plaintiff received an email on or about August 2019, with a date and time for her meeting with the CEO Don Colleran of August 26, 2019 at 1PM.

52.     Plaintiff received the calendar invite and or calendar setting for the meeting with CEO Colleran on or about the week of August 12, 2019. Plaintiff immediately told a co-worker and had the co-worker come over to her desk to show her the appointment she had with the CEO.

53.     On August 26, 2019, prior to the scheduled meeting with CEO Colleran, but near in time, Plaintiff entered Building A and notified Security that Plaintiff had a meeting scheduled with CEO Don Colleran.

54.     This meeting had been on Plaintiff's calendar for a period of weeks, following receipt of an email with the meeting information.

55.     Plaintiff did not create the meeting and believed it had been scheduled by her Senior VP.

56.     Plaintiff's most previous meeting in her efforts to complain about the wrongful treatment and failure of FedEx Express to provide the buyout (she had been led to believe she

would receive) had been with the FedEx Express Senior VP for Litigation, an experienced senior attorney.  This meeting was within a couple weeks of the meeting with the CEO.

57.     Plaintiff's scheduled meeting with CEO Don Colleran had been on Plaintiff's calendar prior to her meeting with the FedEx Express Senior VP for Litigation and Plaintiff had informed the attorney's staff of her meeting with CEO Don Colleran when scheduling the attorney meeting so that Plaintiff could meet with the attorney prior to her meeting with the CEO.

58.     During the meeting with the attorney, which meeting Plaintiff had been directed to attend by her Senior VP, the attorney told Plaintiff that she [the Plaintiff] could retire" This was in response to Plaintiff explaining to the attorney that she [Plaintiff] had not received the buyout she had been led to believe she would receive.

59.     This meeting with the attorney was after Plaintiff had verbally filed an EEO.

60.     Before August 22, 2019, Plaintiff told the attorney's staff the date and time of Plaintiff's scheduled meeting with the CEO.

61.     On the day of Plaintiff's scheduled meeting with CEO Don Colleran, the following events took place.

62.     Plaintiff arrived at Building A, pushed a button from the outside, and was told by Security to come inside. Plaintiff understood, as a long-time employee of FedEx, that you cannot just walk into building A. You must have an appointment or meeting and it must be on the schedule for you to get into Building A and/or to go to any of the floors in Building A.

63.     Once inside Building A, 1st floor, Plaintiff approached the security desk where two security officers were sitting behind the desk. A white male and a black male. Plaintiff was asked by the white officer, "What is your name and who are you here to see?" Plaintiff responded, "My name is Tina Ervin and I am here to see CEO Don Colleran."  The white officer then picked up

the phone and called someone and said, "Tina Ervin is here to see Don Colleran." After the officer hung up the phone, Plaintiff was told to proceed to the elevator.

64.     Plaintiff believed and understood that she could only and would only be allowed to proceed to an elevator if she actually had an appointment and if that appointment had been verified by the downstairs security officer(s) prior to being allowed to go up the elevators.

65.     Plaintiff was not told at the time of her arrival to leave or that she did not have an appointment. It seemed to Plaintiff that security had properly called to confirm that she was on the schedule and once verified, she was allowed to go to the elevator.

66.     Once Plaintiff was inside the elevator, she noticed that a pad was on the wall and the elevator would not move. Therefore, Plaintiff told the officer and he pushed a button from behind his desk and told her to go ahead up to the CEO's office.  Plaintiff told the officer she did not know on what floor the CEO was located. The officer told Plaintiff he was on the 3rd floor and then Plaintiff pushed the elevator pad to go to the 3rd floor.

67.     When the elevator door opened on the 3rd floor, a black female security officer was sitting at the security desk.  She asked Plaintiff as to whom she was there to see, and Plaintiff responded by saying "Don Colleran." Plaintiff then asked as to the location of his office. The security officer told Plaintiff the location of the CEO's office.

68.     At this time, Plaintiff was not asked to leave or told that she did not have a meeting.

69.     When Plaintiff arrived at the CEO's office, the CEO's Admin was at her desk and she greeted Plaintiff and Plaintiff greeted her.  The Admin then asked Plaintiff her name and who she was there to see.  Plaintiff responded, "Tina Ervin to see Don Colleran."

70.     To Plaintiff's surprise, the Admin told Plaintiff she was not on the CEO's calendar and Plaintiff responded by saying "ok, I will call Barb," meaning HR SVP Barbara Wallander.

71.    Plaintiff had always reasonably assumed and believed that Ms. Wallander had scheduled this meeting for Plaintiff with the CEO because Plaintiff had told her of her (Plaintiff's) desire to meet with the CEO, and Plaintiff had asked HR SVP Wallander to arrange the meeting so she could discuss the wrongful denial of her buyout package (VBO), along with other HR Internal issues with the CEO.

72.    The Admin responded to Plaintiff that "I will call her," and she did. Although Plaintiff was not on the phone, she could hear the Admin speaking.

73.    Plaintiff heard the Admin informed the HR SVP that "Tina Ervin is here to see Don" and during their conversation, Plaintiff also heard the Admin say that she would put "us" on a three-way call.  Plaintiff did not know to whom the Admin was referencing, until Plaintiff was told that the SVP attorney, with whom Plaintiff had previously met, was on her way.

74.    On or about the time this call was happening, the CEO came out of his office and asked was everything ok. Plaintiff responded by saying that she had a meeting scheduled with him at 1:00 pm. The CEO Colleran asked "for what" and Plaintiff told him "I guess the VBO."  He then told Plaintiff that he already had a meeting at 1:00 pm and Plaintiff said "Ok."  The CEO then went back into his office.

75.    Shortly thereafter, the SVP attorney came into the Admin's Office. The CEO then came out a second time, this was about 1pm to 1:10pm and asked if anything was wrong. The SVP attorney said "I got it" or "I got it Don" and asked Plaintiff to come with her.

76.    After leaving the area, SVP attorney asked Plaintiff twice who scheduled the meeting with the CEO before entering her office. Plaintiff responded "I guess Barb," meaning the HR SVP.

77.     The SVP attorney then told Plaintiff that they should not talk where they were and proceeded to have Plaintiff follow her to a conference room. At the conference room, the attorney asked a third time as to who scheduled the meeting and Plaintiff again responded, "I guess Barb because it was on my calendar."

78.     The manner of this confrontation was distressing for Plaintiff as she had simply gone to a meeting that had been on her calendar for a period of weeks, a meeting about which she had informed the assistant for the attorney, and a meeting that Plaintiff firmly believed had been scheduled by her SVP so that Plaintiff could discuss the VBO and her concerns (about which she had verbally filed an EEO).

79.     The attorney told Plaintiff, "Tina, I understand your frustration, it is over, you will not see Don nor will you see Fred." To which Plaintiff responded said, "Ok." Plaintiff did not raise her voice. However, SVP attorney did. Plaintiff did not have a meeting scheduled with anyone above the CEO, including that she did not have a meeting scheduled with Mr. Fred Smith.

80.     Plaintiff, distressed, depressed, embarrassed and humiliated for simply going to a meeting, left and went back to her office in Building I.

81.     Plaintiff was not escorted by security, there was no mention of a security issue at the time Plaintiff left Building A.

82.     Plaintiff upset by the events of the day, printed her calendar as she was deeply offended and concerned that she would be falsely accused of having scheduled a meeting with the CEO. Plaintiff was also upset and distressed that, as a female African American long-term employee at FedEx, she was being spoken to in a demeaning manner, denied even a basic meeting with upper management in her chain of command, and told that she would not be allowed to speak with those in her higher chain of command.

83.    In all of Plaintiff's years working at FedEx, she had always understood that the employees could meet with and speak to the management officials in their chain of command. She was upset and shocked that she was essentially accused of pretending to have a meeting with her own CEO.

84.    Plaintiff has had hundreds of meetings while at FedEx Express and has never pretended to have a scheduled meeting which was not really scheduled.

85.    Plaintiff felt she had been humiliated in front of her CEO and wanted to prove her innocence.

86.    Plaintiff as she had always done previously (and prior to verbally filing her internal EEO) followed the chain of command and met with appropriate individuals prior to her scheduled meeting with the CEO. She met with her Sr. VP Barbara Wallander who told Plaintiff that she would try and schedule a meeting with for Plaintiff with the CEO. When Plaintiff asked her as to the date of this meeting, her SVP Wallander said the CEO was out the week of August 12th, indicating it would be after that.  Plaintiff had told her SVP that it would be OK for her SVP to schedule this meeting with the CEO for her. This is why Plaintiff thought the meeting was scheduled by her [Plaintiff's] SRVP.

87.    After Plaintiff's meeting with the HR SVP, Plaintiff received a voicemail from her SVP asking Plaintiff to call the SRVP attorney,  which Plaintiff did. Plaintiff was confused as to why Plaintiff was calling someone who was not in her chain of command but did as she was told.

88.    Upon Plaintiff's return to her office after meeting with the SVP attorney instead of the CEO, Plaintiff shared with one of her peers what had happened then tried to find the IT person for her area to find out who really scheduled the meeting.

89.     In an effort to prove that her SVP was the one to send Plaintiff the email with the meeting time for Plaintiff to meet with the CEO, Plaintiff contacted Manager Greg Fruitt and explained to him that she [Plaintiff] was confused and asked if he could find out who placed a meeting on her outlook calendar. After speaking with the IT Manager, he indicated that he could find out who scheduled the meeting and asked Plaintiff to send him a copy of the scheduled meeting, which she did.  He also asked her if this was part of an investigation, and Plaintiff told him no, because as far as Plaintiff knew, it was not.

90.     At this point of the day, Plaintiff was very stressed and confused, and immediately emailed the SVP attorney a copy of the scheduled meeting which had been on her calendar. At HR SVP Wallander's request, Plaintiff also sent her a copy of the scheduled meeting.

91.     After sending copies of the meeting on her calendar, Plaintiff left for a 2:45 pm scheduled doctor's appointment.

92.     Plaintiff's doctor immediately placed Plaintiff on Medical LOA due to acute stress.

93.     Plaintiff also filed a filed an internal EEO complaint in writing of discrimination.

94.     On or about August 29, 2019 Plaintiff filed an Internal EEO for age discrimination and retaliation.

95.     Plaintiff asserted that she had been retaliated against for filing an appeal on May 13, 2019 regarding the VBO as she had identified "HR internal issues", had raised issues related to her age (including that she did not have proper support as the Affirmative Action Administrator and was being set up for failure, denied proper support for her position, and was moved to an organization unrelated to affirmative action), and that a younger less qualified employee was promoted, assigned support and given the VBO.

96.     On or about October 7, 2019 Plaintiff had a meeting with Attorney Smith regarding additional information that had not yet been placed in writing in Plaintiff's prior date August 29, 2019 EEO.

97.     On or about October 9, 2019, Plaintiff submitted additional written information to be included in her internal EEO. As part of that October 9, 2019 written submittal, Plaintiff clarified in writing that she wanted to "make sure my claim of Race Discrimination is part of this IEEO."

98.     Plaintiff remained off work until early October.

99.     Once Plaintiff returned to work in early October, Plaintiff, by letter dated on or about October 7, 2019, was put on administrative leave and told there would be an investigation. This was completely shocking to Plaintiff. Plaintiff was suspended with pay for an alleged Acceptable Conduct Policy violation. The letter also instructed Plaintiff not to contact any FedEx employee or customer, not to enter any FedEx facility without permission and to turn on her FedEx Express Id, Keys and other FedEx property.

100.    A thorough/reasonable investigation of her IEEO was not conducted.

101.    A thorough/reasonable investigation of the alleged policy violation was also not conducted including the following:

        a.  No one inquired about Plaintiff 's witness (Plaintiff had previously told a co-worker about the calendar meeting well before the meeting happened; and the witness know Plaintiff would not misrepresent her calendar events); and

        b.  No witness for Plaintiff were contacted during this alleged "investigation."

102.    Plaintiff denies misrepresenting having a scheduled meeting with CEO Don Colleran on August 26, 2019 at 1:00 pm.

103.    Completely shockingly, on or about November 5, 2019 Plaintiff was wrongfully terminated for allegedly violating the Acceptable Conduct Policy and the Security Policy. The letter asserted that Plaintiff misrepresented having a meeting with the CEO and was therefore terminated.

104.    Plaintiff did not violate the Acceptable Conduct Policy and did not violate the Security Policy.

105.    Plaintiff has been a loyal and dedicated employee for a very long time, holding an important position at FedEx, earning accolades and appreciation, always performing at a satisfactory or higher level.

106.    It is an affront to Plaintiff's legacy and work at FedEx Express to be terminated for allegedly breaching a Security Policy.

107.    The reasons for Plaintiff's termination in her termination letter are false.

108.    Following Plaintiff's wrongful termination, she was placed on a list of individuals who are a security risk for FedEx.

109.    Plaintiff was humiliated, embarrassed and her job, benefits were wrongfully taken from her, and her reputation were irreparably harmed.

110.    Plaintiff's termination was illegal in that it was retaliatory and/or due to discrimination based upon her race and/or age.

111.    At all times relevant, Defendant was aware of Plaintiff's race, age, and her EEO filings both verbal and in writing.

112.    After Plaintiff was wrongfully terminated, she appealed her termination through the FedEx Express GFTP program. On or about November 8, 2019 Plaintiff submitted her paperwork

to appeal her wrongful terminated pursuant to FedEx Express's Guaranteed Fair Treatment Procedure.

113.    As part of that process, Plaintiff asserted her claims of discrimination and retaliation. She asked to be reinstated with backpay, to be reimbursed for her COBRA expenses, to have her termination status changed to "retired" (which would allow her to receive a retirement badge and other benefits – including discounts on shipments and discounts in air fare), to have all documents related to her termination and/or misconduct removed from her personnel file, and for her to receive the requested VBO package.

114.    Plaintiff had a meeting with an HR Managing Director, Mr. Brown, Plaintiff's Manager, Ms. Johnson, and Corporate Business Advisor, Ms. Paden about the GFTP process.

115.    Some of Plaintiff's witnesses were contacted in connection with the GFTP process.

116.    By letter dated on or about November 22, 2019, Plaintiff was informed that her request to retire in lieu of termination for misconduct would be granted, that she would receive a retiree badge, and that all documents related to her termination for misconduct would be removed from her personnel file.

117.    To receive these items from the GFTP Step I process, Plaintiff had to agree not to continue in the GFTP process.

118.    By email dated on or about December 5, 2019 Plaintiff accepted the offer for her to receive full retirement benefits, and to have the improper documents removed from her personnel file.  Plaintiff also reiterated in that email that she was accepting the offer without waiving any rights that she may have to pursue her other legal options for a more complete remedy, not through the GFTP process.

119.     Plaintiff filed a Charge of Discrimination with the EEOC on or about November 25, 2019 alleging age and race discrimination, and retaliation.

120.     Plaintiff received her Right-to-Sue on or about December 12, 2019. Her Right-to-Sue was mailed on or about December 11, 2019. *See* attached Exhibit B.

<u>**CAUSES OF ACTION**</u>
<u>**COUNT I**</u>
<u>**Discrimination in violation of Title VII of the Civil Rights Act of 1964**</u>

121.     Plaintiff incorporates all the foregoing paragraphs above as if fully set forth herein, and alleges that:

122.     Plaintiff is a member of a protected class covered by Title VII, 42 U.S.C. sec. 2000e, et seq.

123.     The discriminatory actions conduct and/or omissions directed by Defendant through its employees were due to and/or motivated by Plaintiff's race.

124.     Defendant through its agents, representatives and employees, intentionally willfully and knowingly affected the terms and conditions of Plaintiff's employment and engaged in unlawful discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et. seq.

125.     As a direct and proximate result of Defendant's unlawful discriminatory and harassing conduct against Plaintiff, Plaintiff has suffered harm, including but not limited to lost wages, benefits, and damage to her reputation, embarrassment, humiliation, pain and emotional distress and loss of enjoyment of life.

<u>**Count 2**</u>
<u>**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**</u>

126.     Plaintiff incorporates all the foregoing paragraphs above as if fully set forth herein, and alleges that:

127.    Plaintiff is a member of a protected class covered by Title VII, 42 U.S.C. sec. 2000e, *et seq*.

128.    Plaintiff engaged in a protected activity, including that she complained about being discriminated against due to her age (over 40) and race and opposed unlawful practices of the Defendant by making an EEOC charge, filing internal EEO complaints, and she protested unlawful practices by the Defendant.

129.    Defendant was aware of Plaintiff's protected activities.

130.    Defendant, through its agents, representatives and employees, intentionally, willfully and knowingly took adverse action and/or created a hostile work environment because Plaintiff had engaged in protected activities (protesting and opposing unlawful practices) which affected the terms and conditions of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et. seq*.

131.    Defendant, through its agents, representatives and employees, engaged in actions and omissions constituting retaliation (because Plaintiff had engaged in protected activities or opposed unlawful practices) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et. seq*.

132.    As a direct and proximate result of Defendant's unlawful retaliatory conduct against Plaintiff, and as a direct and proximate result of the violations of Plaintiff's federally and Constitutionally protected rights, Plaintiff has suffered harm, including but not limited to lost wages, benefits, and damage to her reputation, embarrassment, humiliation, pain and emotional distress and loss of enjoyment of life.

**Count 3**
**Discrimination in violation of the Age Discrimination in Employment Act**

133.   Plaintiff incorporates all the foregoing paragraphs above as if fully set forth herein, and alleges that:

134.   Plaintiff is a member of the protected class covered by the ADEA.

135.   The actions and omissions (intentional, willful and knowing) by Defendant, through its agents, representatives and employees, constitute unlawful discrimination and/or retaliation against Plaintiff (in that she engaged in a protected activity, among other things by opposing discriminatory employment practices and was retaliated against) in the terms and conditions of her employment based upon her age (over 40) all in violation of Age Discrimination in Employment Act ("ADEA") of 1967, as codified, 29 U.S.C. §§ 621 *et seq*.

136.    Plaintiff seeks injunctive relief to remedy the alleged wrongdoings on the basis that he she no adequate or complete remedy at law to redress the discriminatory practices of Defendant.

137.   As a direct and proximate result of Defendant's unlawful discriminatory, retaliatory and harassing conduct against Plaintiff, and as a direct and proximate result of the violations of Plaintiff's federally and Constitutionally protected rights, Plaintiff has suffered harm including but not limited to lost wages, benefits, and damage to his reputation, embarrassment, humiliation, pain and emotional distress and loss of enjoyment of life

**Count 4**
**Violation of the Tennessee Human Rights Act**

138.   Plaintiff incorporates all the foregoing paragraphs above as if fully set forth herein, and alleges that.

139.   Plaintiff is a member of protected classes covered by the Tennessee Human Rights Act (THRA) (age and race).

140.     Defendants, through its agents, representatives and employees, intentionally, willfully and knowingly discriminated against Plaintiff in the terms and conditions of her employment based upon race (African American) discrimination, age discrimination (over 40), all in violation of the THRA.

141.     Plaintiff endured humiliation, embarrassment and harassment, including that she was wrongfully placed on administrative leave, no appropriate investigation happened, and then she was wrongfully terminated by Defendant.

142.     Plaintiff suffered an adverse employment action.

143.     Plaintiff was treated differently than similarly situated employees outside of her protected class.

144.     Defendant through its agents and employees engaged in racially discriminatory conduct and/or was motivated by Plaintiff's race in engaging in wrongful conduct that adversely affected the terms and conditions of Plaintiff's work.

145.     Plaintiff seeks injunctive relief to remedy the alleged wrongdoings on the basis that she has no adequate or complete remedy at law to redress the discriminatory practices of Defendants.

146.     The acts and omissions of Defendant constitute a violation of Plaintiff's rights in violation of THRA, Tenn. Code Ann. 4-21-311, et. seq., as amended, and have caused Plaintiff substantial damages and injuries, including loss of income and benefits, humiliation, embarrassment and emotional distress.

**Count 5**
**THRA Retaliation**

147.     Plaintiff incorporates all the foregoing paragraphs above as if fully set forth herein, and alleges that:

148.     Plaintiff is a member of a protected class covered by the Tennessee Human Rights Act.

149.     Plaintiff engaged in a protected activity, including that she engaged in activity protected when she complained of the discrimination and hostile work environment to HR verbally and in writing.

150.     Plaintiff's exercise of her civil rights was known to the Defendant.

151.     Defendant through its agents, representatives and employees, intentionally willfully and knowingly took adverse action, terminated her and/or created a hostile work environment due to Plaintiff engaging in a protected activity which affected the terms and conditions of Plaintiff's employment in violation of the Tennessee Human Rights Act.

152.     Defendant through its agents, representatives and employees, engaged in actions and omissions constituting retaliation motivated by Plaintiff's complaints in violation of the Tennessee Human Rights Act.

153.     Plaintiff opposed a practice declared discriminatory by the Tennessee Human Rights Act by way of making a verbal and/or written charge(s), by filing a verbal and/or written complaints about discriminatory practices.

154.     As a direct and proximate result of Defendant's unlawful retaliatory conduct against Plaintiff, and as a direct and proximate result of the violations of Plaintiff's protected rights, Plaintiff has suffered harm, including but not limited to lost wages, benefits, and damage to her reputation, embarrassment, humiliation, pain and emotional distress and loss of enjoyment of life.

<u>DECLARATION</u>

I, Santiana Ervin, in accordance with 28 U.S.C. Section 1746, declare under penalty of perjury that the forgoing is true and correct.

Executed on the 10th day of March, 2020.

Santiana Ervin

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Court enter a judgment in her favor against the Defendants:

1.      A permanent injunction against the Defendant prohibiting any future discriminatory practices as there is no adequate or complete remedy at law to redress the discrimination, retaliation and harassment;

2.      An Order to Defendants to conduct training concerning the prevention of discriminatory; and other equitable relief as may be appropriate;

3.      Backpay, front pay, lost benefits and other pecuniary and economic losses caused by the Defendant's unlawful conduct;

4.      Compensatory damages and losses in an amount to be determined at trial, but not less than $300,000.00;

5.      All reasonable attorneys' fees, costs, pre-judgment and post-judgment interest;

6.      and such further relief as is deemed appropriate.

A JURY TRIAL IS DEMANDED.

Respectfully Submitted,

HOLLAND & ASSOCIATES, PC

s/Maureen T. Holland, Esq.
Maureen T. Holland, Esq. #15202
Yvette H. Kirk, Esq. #32174
1429 Madison Avenue
Memphis, TN 38104
Telephone: (901) 278- 8120
Facsimile: (901) 278-8125